1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3    SHOSHANA COOPER and SARA KUPER, )
                                     )
4              Plaintiffs,           )
                                     )
5       v.                           )  No. 12 C 5104
                                     )
6    MONTY G. CASSIDY,               )  Chicago, Illinois
                                     )  August 12, 2015
7              Defendant.            )  2:40 p.m.

8          EXCERPT TRANSCRIPT OF PROCEEDINGS - BERTRAM KRAFT

9          BEFORE THE HONORABLE RONALD A. GUZMAN AND A JURY

10   APPEARANCES:

11   For the Plaintiffs:   LAW OFFICE OF STEPHEN L. RICHARDS
                           BY:  MR. STEPHEN L. RICHARDS
12                              MR. JOSHUA SAMUEL MILDER RICHARDS
                           651 West Washington
13                         Suite 205
                           Chicago, Illinois 60661
14                         (773) 917-6927

15   For the Defendant:    CITY OF CHICAGO
                           DEPARTMENT OF LAW
16                         BY:  MS. MARY SARA McDONALD
                                MS. MARION CLAIRE MOORE
17                              MS. LINDSAY ERIN WILSON GOWIN
                           30 North LaSalle Street
18                         Suite 900
                           Chicago, Illinois 60602
19                         (312) 744-8307

20   NOTE:  THIS IS AN EXCERPT OF PROCEEDINGS.  PAGE NUMBERING WILL
     NOT CORRESPOND TO ANY COMPLETE TRIAL TRANSCRIPT THAT MAY BE
21   PREPARED.

22   Court Reporter:       Judith A. Walsh, CSR, RDR, CRR
                           Official Court Reporter
23                         219 S. Dearborn Street, Room 1944
                           Chicago, Illinois 60604
24                         (312) 702-8865
                           judith_walsh@ilnd.uscourts.gov
25

Kraft - direct

2

```
 1    (Proceedings heard in open court.  Jury out.)
 2         THE COURT:  Ready for the jury?
 3         MR. S. RICHARDS:  Yes, your Honor.
 4         MR. J. RICHARDS:  Yes, your Honor.
 5         MS. GOWIN:  Yes, your Honor.
 6         THE COURT:  Okay.  Bring them out.
 7    (Proceedings heard in open court.  Jury in.)
 8         THE COURT:  Call your next.
 9         MR. J. RICHARDS:  We call Dr. Bertram Kraft.
10         THE COURT:  Please remain standing, sir, and raise
11  your right hand.
12    (Witness sworn.)
13         THE WITNESS:  I do.
14         THE CLERK:  Please be seated.
15         MR. J. RICHARDS:  Your Honor, may I proceed?
16         THE COURT:  You may.
17          BERTRAM KRAFT, PLAINTIFFS'S WITNESS, SWORN
18                      DIRECT EXAMINATION
19  BY MR. J. RICHARDS:
20  Q.  Dr. Kraft, can you please state your name for the record
21  and spell your last name for the benefit of the court
22  reporter?
23  A.  Bertram Kraft, K-r-a-f-t.
24  Q.  And what is your profession?
25  A.  I am an ophthalmologist.
```

Kraft - direct

3

1   Q.  Are you currently practicing?

2   A.  Yes, I am.

3   Q.  Are you employed by anyone?

4   A.  I'm employed by myself.

5   Q.  Do you have a corporation or a company?

6   A.  Yes.  I have a corporation, and then I'm employed by my

7   corporation.

8   Q.  And what is that corporation called?

9   A.  It's called Total Eye Care.

10  Q.  And how long have you been employed by Total Eye Care?

11  A.  Since 1975.

12  Q.  How many employees does Total Eye Care have?

13  A.  At the present time, we have about seven or eight.

14  Q.  How many of those are doctors?

15  A.  One other than myself.

16  Q.  And what do the rest of the employees do?

17  A.  I have a billing specialist.  I have an office manager,

18  receptionist.  We have an optician.  I have a technician and

19  another -- and an optometrist.

20  Q.  When did you go to medical school?

21  A.  I went to medical school from 1965 to 1969.

22  Q.  And where did you go?

23  A.  The University of Illinois here in Chicago.

24  Q.  What degree did you graduate with?

25  A.  Med -- M.D. degree, medical doctor.

Kraft - direct

4

1   Q.  Did you graduate with any honors or awards?

2   A.  I was a member of the AOA, American Op -- American -- I

3   forget what you call it.  It's just -- I forget what it stands

4   for.  AOA is Omega.  It's the honor society of the medical

5   school.

6   Q.  And after graduation, did you participate in an

7   internship?

8   A.  Yes, I did.

9   Q.  When was that?

10  A.  The following year, from 1969 to 1970.

11  Q.  What type of internship was that?

12  A.  I did a straight, what we call a straight medical

13  internship at the University of Illinois.

14  Q.  What does a straight medical internship mean?

15  A.  That means that we devoted all of our time to medical

16  specialties and not to surgical specialties.  In those days,

17  it was either a medical, straight medical or straight

18  surgical.

19  Q.  After that internship, what did you do next?

20  A.  I did a residency in ophthalmology.

21  Q.  Where was that?

22  A.  That was at Michael Reese Hospital here in Chicago.

23  Q.  How long was that residency?

24  A.  That residency was three years.

25  Q.  What did that residency training involve?

1    A.   Training in ophthalmology.  We spent three months at

2   Harvard Medical School to do a basic instruction course, and

3   that included hands-on patient care in learning the medical

4   side of ophthalmology as well as the surgical side of

5   ophthalmology.

6    Q.   After residency, what happened next?

7    A.   I then went into the Army.  I spent two years at Fort

8   Knox, Kentucky.

9    Q.   Were you a doctor in the Army?

10   A.   I was a doctor in the Army.  I was chief of the eye clinic

11   at Fort Knox.

12   Q.   Where did you go next after that?

13   A.   I came back to Chicago, and I started my own practice here

14   in Chicago.

15   Q.   Are you currently licensed to practice medicine in the

16   state of Illinois?

17   A.   Yes, I am.

18   Q.   What is that license in?

19   A.   It's an unrestricted license as a physician and surgeon in

20   Illinois.

21   Q.   Have you ever been licensed anywhere else?

22   A.   No.

23   Q.   Are you licensed in any specialty?

24   A.   There is no licensure in any other specialty, as far as I

25   know.  It's just, you're just a medical doctor.  They don't

Kraft - direct

1  license specialties.

2  Q.  Do you belong to any professional organizations?

3  A.  Yes.

4  Q.  What organizations?

5  A.  I belong to the American Academy of Ophthalmology,

6  American Society of Cataract and Refractive Surgery, the

7  Illinois Association of Ophthalmology.  Those are the main

8  ones.

9  Q.  Are there others?

10  A.  There may be.  I'm not sure.  I haven't looked at my

11  resumé recently.

12  Q.  Besides Total Eye Care, do you hold any other positions?

13  A.  No, not at this time.

14  Q.  Do you read any journals or publications?

15  A.  Yes.

16  Q.  Such as?

17  A.  The Journal of the American Academy of Ophthalmology, the

18  Journal of the American Medical Association in Ophthalmology,

19  and the Journal of the American Society of Cataract and

20  Refractive Surgery.  Those are the three main journals that I

21  read.

22  Q.  And you read other smaller journals?

23  A.  There are other journals that we get all the time, yes.

24  Q.  Do you have any admitting privileges at any hospital?

25  A.  Yes, I do.

Kraft - direct

7

1   Q.   Which hospital?

2   A.   Well, North Shore University Health Systems, which is the

3   University of -- now they call it North Shore University,

4   which is Evanston Hospital, Glenbrook Hospital, Highland Park

5   Hospital, and Skokie Valley Hospital.

6   Q.   Is that the area where your office is located?

7   A.   It's geographically close by, yes.

8   Q.   Do you have to do any continuing medical education?

9   A.   Yes.  We're required to do 40 hours of continuing medical

10  education per year.

11  Q.   And what does that 40 hours consist of?

12  A.   It consists of a combination of reading and course work.

13  Q.   Do you -- have you ever gone to any meetings?

14  A.   Yes.  I go to -- I usually go to at least one, one

15  week-long meeting per year.

16  Q.   Does that meeting have any title?

17  A.   Well, the -- most meetings are given either by the Academy

18  of Ophthalmology or -- the American Academy of Ophthalmology

19  or the American Society of Cataract and Refractive Surgery.

20  One has a meeting in the fall, and one has a meeting in the

21  spring, and I'll go to one or both of them each year.

22  Q.   And does going to one of those meetings satisfy the

23  40-hour requirement?

24  A.   It would probably give you close to 35 hours.

25  Q.   And how many of those have you attended within the past

 1   ten years?

 2   A.  I would say at least one a year.

 3   Q.  Now, in the course of your entire career, how many

 4   patients have you seen?

 5   A.  I've been in practice for 40 years.  And if you were to

 6   say I saw 100 patients a week, I guess -- you're probably

 7   talking about 80,000 patients, maybe more.  Maybe I'm off by a

 8   zero.

 9          MR. J. RICHARDS:  Your Honor, at this time, the

10   plaintiff seeks to ask the Court to declare that Dr. Bertram

11   Kraft is an expert in general ophthalmology.

12          MS. GOWIN:  Defense objects for the reasons

13   previously raised.

14          THE COURT:  The objection is overruled.  The witness

15   may testify as an expert in ophthalmology and give opinions on

16   that subject matter.

17          MR. J. RICHARDS:  Your Honor, may I continue?

18          May I continue?

19          THE COURT:  Yes.

20   BY MR. J. RICHARDS:

21   Q.  In the case at bar, did you form an opinion?

22   A.  Yes, I have.

23   Q.  What is that opinion?

24   A.  It's my opinion that Ms. Kuper suffered a central vein

25   occlusion due to an acute episode of high blood pressure.

Kraft - direct

9

1  Q.  When you say "Ms. Kuper," do you mean Sara Kuper?

2  A.  Sara Kuper, yes.

3  Q.  What did you rely on to form this opinion?

4  A.  I relied on my examination of Ms. Kuper.  I relied on my

5  notes of Ms. Kuper.  And I relied on a consultation letter

6  that I received from Dr. Robert Schroeder.

7  Q.  Now, I'd like to start out with the anatomy of the eye.

8  Are there parts of the eye?

9  A.  Yes.  The eye, although it's a very small organ of the

10 body, it's a very complex organ.  The eye, you can think of

11 the eye as a ball and with a tail on it.

12       As you look at your eye, everybody can see the white.

13 The white is the thick supporting structure like the outside

14 of your basketball.  The front of the eye is the cornea.  And

15 through the cornea is where the light comes into the eye.  So

16 the colored part of our eye, brown, blue, is called the iris.

17 The center part of that which is dark is called the pupil.

18 Behind the pupil sits the lens.

19       The lens of the eye, the function of the lens of the

20 eye is to take the light that we see so that it shines on the

21 back layer of the inside of the retina -- of the cornea --

22 excuse me, of the eyeball itself, the sclera.

23       So the retina is what we call that inside layer.

24 Most people used to think of it like the film of a camera.  It

25 is actually seven layers thick.  And there's about 7 million

Kraft - direct

1    cells in the eyeball.

2    Q.  Can I stop you there?  The 7 million cells in the eyeball,

3    what do they do?

4    A.  Well, they function as processors for sight.  So each one

5    of those cells is hardwired so that when the light hits it,

6    the light will stimulate that cell.  That cell will then send

7    an electrical stimulus to our brain in the back of our eye.

8    Our computer is back here in the back of our head.  All this

9    light that we see up front goes into the back.

10         But because each -- because the eye is a curve, each

11   one of those cells is hardwired where the dimension.  So if

12   part of that curve is over this way, the light hits it from

13   there, it's going to tell my brain that's where the light is

14   coming from.

15         But if that cell is moved out of direction and that

16   cell still gets hit by a light coming from that direction, my

17   brain thinks it's coming from over there.  So that's how you

18   lose your vision and how vision gets distorted.

19   Q.  Now, you mentioned traveling, the information traveling

20   from the front of the eye to the back of the brain.  What

21   pathway does that information take?

22   A.  Well, as I said earlier, the eyeball has a little tail on

23   it.  That tail is actually the optic nerve.  All of those 7

24   million cells lead in one area.  And that's called the optic

25   nerve.  It goes through our eyeball, through a hole in our

Kraft - direct

11

1   skull, and then it radiates on the side of the brain called

2   the optic radiation and into our computer in the back.

3   Q.   What does the optic nerve look like?

4   A.   I guess between the back of the eyeball and where it goes

5   into the skull, into the brain itself, it's approximately

6   three-quarters of an inch long.   It's about a half an inch in

7   diameter.

8   Q.   Besides those cells, those neurons, what else is in the

9   optic nerve?

10  A.   In the optic nerve, there's also the ophthalmic artery and

11  the ophthalmic vein.

12  Q.   What is an artery and what is a vein?

13  A.   Well, an artery is a vessel in the body that is -- brings

14  oxygenated or nutritious blood to parts of the body.   The body

15  then uses that.   And then the veins are the waste product

16  which are brought back into the body.   So the veins then will

17  go to the lungs, get reoxygenated, and go back and forth.   So

18  it's a system of arteries and veins.

19  Q.   Is it fair to say that the artery is blood coming from the

20  heart?

21  A.   Artery is fresh blood coming from the heart, yes.

22  Q.   How big is that artery in the optic nerve?

23  A.   That artery is probably no more than a millimeter or two

24  at the very maximum, probably less than -- probably about a

25  millimeter in diameter, in diameter.

                            Kraft - direct

1    Q.  I was just about to ask --

2    A.  Right.

3    Q.  -- diameter or length.

4            And what about the vein?

5    A.  The vein is usually just a little bit larger but not much

6    larger.

7    Q.  And within the optic nerve, the artery and vein, what's

8    their spatial relationship to each other?

9    A.  In the -- as it goes to the nerve, they are right next to

10   each other.  And they course through the -- they branch off

11   the carotid artery which is where all the vessels come from.

12           They then will go through the optic nerve right next

13   to each other.  They make a 90-degree bend at one point as it

14   enters into the eyeball itself, and then they start separating

15   and branch out from there.

16   Q.  What is a retinal vein occlusion -- I mean, excuse me.

17   What is a central retinal vein occlusion?

18   A.  A central retinal vein occlusion is when the -- if you can

19   think of the arteries and veins as a tree, it's when the trunk

20   of the tree gets obstructed so that there's an occlusion of

21   the artery or the vein -- the vein in the base of the tree, so

22   where the two of them are together, and they're solid pieces.

23   Q.  So looking at that term, central retinal vein occlusion,

24   what does "occlusion" mean?

25   A.  Occlusion means that there's a blockage of some sort.

Kraft - direct

13

1    Q.  And "central" means?

2    A.  Well, central would be the cen -- we call it central

3    because if you look at the back of an eyeball, there are

4    branches like a tree.  Sometimes only one branch can get

5    blocked off, and we would call that a branch retinal vein

6    occlusion.

7           But because this one occurred down further on, all of

8    the branches were affected, so we call it by one name, a

9    central branch occlusion.

10   Q.  How is a central retinal vein occlusion diagnosed?

11   A.  You diagnose it just by examination.  It's a picture that

12   we see in the eye that is virtually -- nothing else is

13   comparable to it.

14   Q.  I want to move to that examination.  How does an

15   examination with a patient start?

16   A.  In this particular examination, we would take a history.

17   The history here was that she had a three-day history of

18   not --

19   Q.  Let me stop you.  I mean in general.

20   A.  In general.  Okay.  A person would come in.  We would

21   still take a history, find out what their complaint was.  Then

22   we would take their vision.  And then we would dilate their

23   eyes.

24          Dilation means that we would put drops in their eyes

25   to open up the pupil so that it's much easier for us to take a

Kraft - direct

14

1   look into the back of the eye to be able to fully examine it.

2   Q.  So let me start off with taking vision.  What does that

3   involve?

4   A.  Vision is where we put a paddle, we call it a paddle, over

5   one eye.  And we ask them to read the chart in the examining

6   room.  And depending -- and how they read that chart tells us

7   what their, quote, vision is at that time.

8   Q.  And is that vision something like 20/20 or --

9   A.  Well, vision, normal vision is called -- or perfect vision

10  is called 20/20.  That means, 20/20 means that what I can --

11  that object, a certain object that I can see 20 feet away is

12  20/20 vision.

13          So if someone sees 20/40 vision, that means that what

14  I can see at 40 feet away, they have to be 20 feet away.  Or

15  somebody has 20/100 vision means that what I can see 100 feet

16  away, they have to be only 20 feet away to see it.

17  Q.  And after dilation, you mentioned that you look into the

18  eye.  How do you go about doing that?

19  A.  Well, I use what we call a 90-degree lens.  We would --

20  after dilating the patient's eye, we would put them into a

21  slit lamp.  A slit lamp is an instrument where their chin

22  rests on a machine.

23          I'm looking behind a -- two oculars like a

24  microscope.  I'm holding a particular lens over the front of

25  her eye.  And through this lens, I am able to see into the

Kraft - direct

1    back of the eye with a three-dimensional view.

2    Q.  Is there another method to look into the back of the eye?

3    A.  Yes.  Some people also do what we call a BIO, or

4    biomicroscopy where they put on like a headlamp.  Okay.  And

5    using a similar type lens, they just use the headlamp to look

6    at it at the back of the eye.

7    Q.  What's the difference between the two?

8    A.  Actually, when use the headlamp, you have a wider field of

9    view but less magnification.  And with the smaller one, you

10   get higher magnification but a slightly less view.

11   Q.  Now, when you look into the back of the eye, what are you

12   looking for?

13   A.  Well, we're looking for, when we look in the back of the

14   eye, we're looking at the retina.  And the retina has arteries

15   and veins and nerve tissues.  So we're just looking to make

16   sure that everything is normal in the back of the eye, looking

17   at all the structures that are back there.

18   Q.  Now, with a central retinal vein occlusion, what would the

19   back of the eye look like?

20   A.  The back of the eye would be full of hemorrhages and

21   sometimes white spots.  And there would be swelling of the

22   macula in many cases, which is the central part of the eye.

23   Q.  So when an ophthalmologist sees that, is then there an

24   immediate diagnosis of central retinal vein occlusion?

25   A.  You would be 99 percent certain that that's a central

Kraft - direct

16

 1  retinal vein occlusion.

 2  Q.   In general, after that diagnosis, what happens next?

 3  A.   Well, it depends on what stage the patient has come in

 4  with.  If the patient comes in with fairly decent vision, we

 5  would try to find out what their preexisting history was, why

 6  they got this condition.

 7        So we would generally send them to their medical

 8  doctor.  And we would ask the medical doctor to work up the

 9  patient for things like high blood pressure, diabetes,

10  cholesterol, or any kind of bleeding tendencies that they

11  might have.

12        And then we would just watch the patient.  If the

13  patient has fairly decent vision at the time they come in,

14  there's a very good chance that they may recover.  And we

15  would watch them over a three or four-month period.

16        If they have not gotten better or if they've gotten

17  worse, then we would probably send them to a specialist to

18  have other tests done.

19  Q.   What type of specialist would that be?

20  A.   We would send them to a retinologist, which is an

21  ophthalmologist who specializes in retinal diseases.

22  Q.   Does the retinologist diagnose central retinal vein

23  occlusion?

24  A.   Well, he would confirm our diagnosis.  But basically, we

25  would send them to see if there was any form of treatment

Kraft - direct

1   which would help to prevent it from getting worse or possibly

2   make it better.

3   Q.  How would a retinologist determine that?

4   A.  He would do, besides his own examination, taking his own

5   history and everything, he would do a fluorescein angiogram

6   and a optical coherence tomography.

7   Q.  So let's take that first one.  Could you spell that for

8   the record, the fluorescein?

9   A.  Fluorescein, f-l-u-o-r-o-s-c-e-i-n.  Angiography,

10  a-n-g-i-o-g-r-a-p-h-y.

11  Q.  And what is that procedure?

12  A.  Well, that, it's similar to when people have a cardiac

13  catheterization.  They dilate the patient's eye.  They'll

14  inject the dye into their vein, and then they'll take pictures

15  of the back of the eye.

16          And these pictures, depending upon how quickly the

17  blood flows into the eye and how it disperses in the eye will

18  give you a diagnostic picture of what's going on with the

19  vascularization of the eye.

20  Q.  What do you mean by "vascularization"?

21  A.  Well, we're looking -- angiography is something that you

22  do for blood vessels.  We want to know, are her blood vessels

23  leaking, are they leaking because of the occlusion; are they

24  all clotted up; are there no blood coming into the eye.  So

25  you will look for all these different things when you do the

Kraft - direct

18

1    angiogram.

2    Q.  And you mentioned a second procedure.  What was that?

3    A.  That was called optical coherence tomography.  And this is

4    a noninvasive test which is why it's used a lot these days

5    because the patient just needs to put their chin on a holder

6    and look into a machine.

7            And about, you know, 5 or 7,000 times a second, light

8    rays are directed back and forth through the eye.  And what

9    that does is it gives an independent measurement of the

10   thickness of the nerve in the back of the eye.

11           Because it's noninvasive, it's very good to use that

12   to follow a patient along to see if they're getting better.

13   So if they have a lot of swelling, this will tell us if the

14   swelling is less, say, in a month or two months down the road.

15   Q.  When a retinologist does these procedures, does the

16   retinologist then send the results of the procedures back to

17   the ophthalmologist?

18   A.  He would send it back to the referring ophthalmologist,

19   yes.

20   Q.  And you mentioned treatment.  What are the various types

21   of treatment?

22   A.  Well, up until the last few years, there was really very

23   little treatment other than finding out the cause.  So if we

24   found out that the patient had high blood pressure, you would

25   treat their high blood pressure.  Or if they had diabetes,

Kraft - direct

19

1    then you would treat their diabetes.

2           Now we have certain injections that we can actually

3    inject inside the eyeball to help prevent the swelling and

4    some of the long-term complications that are associated with

5    central retinal vein occlusion.

6    Q.   What are some of those long-term complications?

7    A.   Well, the vision could get considerably worse because of

8    persistent swelling in the back of the eye.  They can develop

9    what we call a secondary glaucoma which is a type of glaucoma

10   that's very difficult to treat.  And they could just go on to

11   lose their vision.

12   Q.   Now, with central retinal vein occlusion, what is the

13   biological mechanism that occludes the vein?

14   A.   Well, could you rephrase that?

15   Q.   Sure.  Are there any risk factors that would place a

16   patient in greater risk for a central retinal vein occlusion?

17   A.   Okay.  The -- it is believed that high blood pressure is

18   the number one risk factor for central retinal vein occlusion.

19   Second highest risk factor is about -- is diabetes.  Third

20   highest would be high cholesterol.  Those account for probably

21   90 percent of the risk factors.  And I'm just sort of guessing

22   at that number.

23          Then there are a few other risk factors that are

24   associated with central vein occlusion.

25   Q.   Now, with the risk factor of high blood pressure, how does

Kraft - direct

20

 1   that lead to a central retinal vein occlusion?

 2   A.  Well, what happens is, is that when you have high blood

 3   pressure, it means that the blood pressure is a number like

 4   120/80.  High blood pressure means that top number, the

 5   systolic number, is much higher, 200, 220.

 6        So when the heart -- every time the heart beats, it's

 7   pushing out this big head of steam.  Okay.  And as one ages --

 8   well, let me put it this way.  When one is young, the blood

 9   vessels are very pliable.  They can expand real easily and

10   they can contract.  So someone who is young and has high blood

11   pressure, they don't feel it very much, and they don't have a

12   lot of complications.

13        As one ages in everybody, the arteries get more

14   thickened and they get harder and they get less elastic.  So

15   now you have this big head of steam coming through a tube that

16   can't expand anymore, but it can expand some but not as much

17   as it used to.

18        What happens in central retinal vein occlusion is

19   that at the junction where the artery and the vein are next to

20   each other, in most cases there is a curve, a bend of the eye.

21   When that artery expands, it pushes against the vein and

22   mechanically blocks off the blood flow.  And that leads then

23   to turbulence of the blood flow.  And that leads to a blood

24   clot.  And everything dams up behind it.

25        You have to think of it as a circulation.  It goes

Kraft - direct

1  big here, all the little vessels here, and they come down

2  again and go up another vessel.  Okay.  Well, if that vessel

3  at the end, if it can't get out, the blood has nowhere to go

4  but to dam up on itself.  And that leads to all the

5  hemorrhages.  All the small vessels are breaking in the eye.

6  And that's the picture that you get.

7  Q.  How fast does it take for that expanding artery to block

8  off the vein?

9  A.  It can occur in moments.  Okay.  You know, it's hard to

10  say exactly how long it would take but if you -- someone who

11  has high blood pressure and their heart, for instance, is

12  beating very rapidly, you sort of have a constant head right

13  there.  The artery has no chance to come back, so to speak.

14      If you -- you know, if you have a balloon, it goes up

15  and down.  If it was slow, that's one thing but if it's really

16  fast, there's no chance for that artery to re-constrict and

17  relieve any momentary pressure.  So it should -- doesn't have

18  to take very long for the artery to totally block off the

19  vein.

20  Q.  Now, I'd like to turn your attention to Sara Kuper.  How

21  long have you known Sara Kuper?

22  A.  She's been a patient of mine since the mid-1980s.

23  Q.  And now I'd like to turn your attention to September 8th,

24  2011.  Did you see Sara Kuper that day?

25  A.  Yes, I did.

Kraft - direct

1   Q.  And what happened when you saw her?

2   A.  Sara came in with a complaint of a three-day history of

3   not being able to see very well out of her right eye.  We took

4   her vision.  At that time, her vision was 20/50.

5   Q.  Let me stop you there.  20/50 in which eye?

6   A.  In her right eye.  Her left eye, her vision was counting

7   fingers because she was essentially blind in her left eye.

8   Q.  Why was she essentially blind in her left eye?

9   A.  She has macular degeneration and had a vein occlusion in

10  her left eye two or three years earlier.

11  Q.  And that's a central retinal vein occlusion?

12  A.  I believe so, yes.

13  Q.  Now, can a blockage, an occlusion in one eye cause an

14  occlusion in another eye?

15  A.  No.  They're unrelated.

16  Q.  Now, when -- after you took the vision, what did you do

17  next?

18  A.  Well, we dilated her and -- well, actually I think we took

19  her pressure first.  We always take a pressure of the

20  patient's eye because she is also a glaucoma patient.

21  Q.  How do you take the pressure of a patient's eye?

22  A.  We -- to take the pressure of an eye, we would put a

23  numbing drop in the eye.  And then we touch the eye with a

24  special instrument which is calibrated to take the pressure.

25  That's something that you would do, we do on everybody who has

Kraft - direct

1    an eye exam to check for things like glaucoma.

2           Ms. Kuper has glaucoma, so that's always one of the

3    thoughts that would go through our mind when someone comes in

4    and blurry vision, has her glaucoma worsened or something.  So

5    in her case, we would immediately take the pressure.

6           Her pressure was normal on that day.  So then we

7    were -- felt that it was safe to dilate her eye so that we

8    could take a look into the back of her eye.

9    Q.  And what did you see when you looked into the back of her

10   eye that day?

11   A.  We saw all the characteristic findings of a central

12   retinal vein occlusion.

13   Q.  What did you do after that?

14   A.  We immediately referred her to a retinal specialist and

15   arranged for her to see him that afternoon.

16   Q.  Did you -- did you find out that she went to the

17   retinologist?

18   A.  Well, we made sure she went.

19   Q.  Which retinologist was that?

20   A.  That was Dr. Schroeder.

21   Q.  Did Dr. Schroeder tell you what happened when he examined

22   Sara Kuper?

23   A.  I have a letter from Dr. Schroeder which explained what

24   his findings were and what he did.

25   Q.  What did you learn?

Kraft - direct

 1  A.  Well, at that point he confirmed the diagnosis of a vein

 2  occlusion, and he confirmed the diagnosis that she had some

 3  what we call macular edema, some swelling of a particular part

 4  of the eye that was why her vision had been reduced.  And he

 5  felt she was a good candidate to have these injections in the

 6  eye in order to prevent further damage from occurring.

 7  Q.  Was her eye injected?

 8  A.  I believe she had an injection that day, yes.

 9  Q.  What was that an injection of?

10  A.  That was an injection of -- he either gave her Lucentis or

11  Avastin.  These are what we call anti-endothelial growth

12  factors.  One of the things that you -- if someone has a cut

13  in their body, you want to form new blood vessels to form a

14  scar to hold things together.

15       New blood vessels in the eye are not very good to

16  have because new blood vessels in the eye lead to scarring in

17  the eye and loss of vision.  So we wanted to inject these in

18  her eye in order to prevent new blood vessels from growing.

19  And that was to try to preserve what vision she had.

20       Being blind in her other eye, she was at very high

21  risk.  Okay.  And you didn't want to take any chance if there

22  was a possibility that some of this treatment could help her.

23  Q.  What is the process of getting that shot?

24  A.  Well, I -- you would numb the eye.  And in the office,

25  they actually put an eyelid retractor in the eye to hold the

Kraft - direct

1    eye open.  The patient has to be very still.  And a needle is

2    injected right into the eyeball with about one-tenth of a cc.

3    of this material, and then the needle is removed.  Then they

4    use antibiotic drops for a couple days and are asked not to

5    rub their eye.

6    Q.  Is it a painful procedure?

7    A.  I don't know.  I have never had one, so I cannot tell you.

8    Q.  Now, you had mentioned those three main factors:  The high

9    blood pressure, the diabetes, and the cholesterol.  Has -- do

10   you know if Sara Kuper has a history of high blood pressure?

11   A.  Yes, Sara had a history of high blood pressure.

12   Q.  What about diabetes?

13   A.  There's never been a history of diabetes.

14   Q.  What about cholesterol?

15   A.  I don't believe she had high cholesterol, but I'm not

16   absolutely certain.

17   Q.  Now, those are the three main risk factors, but you

18   mentioned that there are some other risk factors?

19   A.  That is correct.

20   Q.  What are some of those?

21   A.  Well, some of them would actually be things like

22   dehydration.  There are various genetic factors and clotting,

23   the clotting mechanism, some forms of hemophilia and things of

24   that nature.  They're obscure, and I'm not an expert on those.

25   Q.  But do you know about factor V Leiden?

Kraft - direct

26

 1    A.   Factor V Leiden is a risk factor, yes.

 2    Q.   What is factor V Leiden?

 3              MS. GOWIN:  Objection, your Honor.  This is beyond

 4    his area of expertise.

 5              MR. S. RICHARDS:  Your Honor, factor V Leiden is one

 6    of the risk factors that go towards central retinal vein

 7    occlusion.  Now, I believe I can bring out from Dr. Kraft how

 8    he would know about factor V Leiden and how it affects a

 9    patient.

10              THE COURT:  The objection will be overruled.  Proceed

11    that way.

12              MS. GOWIN:  I'm sorry, your Honor.  The way I

13    anticipate he's going to try to establish that is completely

14    improper.  May we have a sidebar?

15              THE COURT:  Sure.  Let's have a sidebar.

16       (Proceedings heard at sidebar:)

17              THE COURT:  What's the objection?

18              MS. GOWIN:  Your Honor, I anticipate -- what I

19    anticipate that plaintiff is going to try to do here is to

20    establish that Dr. Kraft has some expertise or knowledge of

21    factor V Leiden based on the fact that his wife has such a

22    genetic mutation.

23              And is that what you intend to do before I go any

24    further?

25              MR. J. RICHARDS:  No.

 1             MS. GOWIN:  How do you intend to do it?

 2             MR. J. RICHARDS:  I'm going to ask him, do you know

 3    what factor V Leiden is?  It's a factor that is present in

 4    some people who present with central retinal vein occlusion.

 5             As a doctor, then I'll next ask him, well, is it a

 6    genetic disease, which it is.  A doctor would know that.  I'll

 7    ask then about, well, specifically genetics in that someone

 8    can be homozygous or heterozygous.

 9             And there's data that shows that someone who is

10    homozygous, which means they get the factor from both their

11    parents, they have a much higher increased risk of developing

12    a clot as opposed to someone who is heterozygous.

13             Sara Kuper is heterozygous.  And he knows that

14    because the test was done and shown to him that she is

15    heterozygous.

16             MS. GOWIN:  There's nothing in the records that he

17    reviewed that showed that.  There's nothing in the records

18    that he relied upon for his opinion that he ever learned that

19    information before reaching this conclusion.

20             MR. J. RICHARDS:  Well, his opinion also as he stated

21    comes from not just the records but his patient examination

22    with Ms. Kuper.

23             MS. GOWIN:  That's not what this is.

24             THE COURT:  But this is a test that was done.

25             MR. J. RICHARDS:  Yes.

```
 1              THE COURT:  Did you disclose that to them, that he's

 2    relying upon the results of this test?

 3              MR. J. RICHARDS:  I believe that should be somewhere

 4    in the deposition.  I mean --

 5              MS. GOWIN:  There's not one word about this

 6    heterozygous or any of that stuff in there.  And the report

 7    there says nothing about this test.

 8              THE COURT:  He didn't testify to this in the

 9    deposition?

10              MS. McDONALD:  No.

11              MR. S. RICHARDS:  No.

12              MS. GOWIN:  Absolutely not.

13              THE COURT:  It wasn't in the report which you gave

14    them which was probably about two sentences.

15              I'll sustain the objection.  It hasn't been properly

16    disclosed.

17              MS. GOWIN:  Thank you, your Honor.

18       (Proceedings heard in open court:)

19    BY MR. J. RICHARDS:

20    Q.  Now, I'd like to go back to your opinion.  How did you

21    come to form that opinion?

22    A.  On the basis of my examination, the basis of her history,

23    and on the basis of Dr. Schroeder's letter to me.

24    Q.  Now, let's talk about her history.  How did that factor

25    into the opinion?
```

Kraft - direct

1   A.  Her history was of one of sudden loss of vision over the

2   past three days.  And that was enough.

3   Q.  Is a central retinal vein occlusion considered a stroke?

4   A.  In layman's terms, you can consider it a stroke, yes.

5   Q.  And what is a stroke?

6         MS. GOWIN:  Objection.  This is beyond the scope of

7   his opinion and beyond his expertise.  He just said it's not a

8   stroke.

9         THE COURT:  Overruled.

10  BY MR. J. RICHARDS:

11  Q.  And what is a stroke?

12  A.  Well, a stroke would be a condition in which there is a

13  lack of blood supply to a particular organ in the body.  So if

14  you -- it can be done through either a hemorrhage, some blood

15  vessel may have broken or due to a clot where a vessel got

16  occluded.  So "stroke" is a general term for a couple of

17  different causes.

18        In this particular case, a stroke in the eye, we like

19  to refer it that because it was a clot.  And the clot has

20  caused everything to back up.  And the nerve cells will die as

21  a result of it.

22  Q.  Can fear or anxiety cause a sudden increase in blood

23  pressure?

24  A.  Yes.

25        MR. J. RICHARDS:  Tender the witness.

Kraft - cross

30

1              THE COURT:  Cross-examine.

2                        CROSS-EXAMINATION

3   BY MS. GOWIN:

4   Q.  Good afternoon, Dr. Kraft.

5   A.  Good afternoon.

6   Q.  I'm Lindsay Gowin.  I represent Officer Cassidy.  We met

7   in the hallway, right?

8   A.  Yes.

9   Q.  Are you still doing okay on water up there?

10  A.  Yes.  I'm okay.  Thank you.

11  Q.  Excellent.  If you need anything, let me know.  Okay.

12          Dr. Kraft, you're not testifying that something

13  Officer Cassidy did caused the central retinal vein occlusion

14  in Sara Kuper's right eye, correct?

15  A.  I did not hear all that.  Could you please speak a little

16  louder?

17  Q.  Certainly.  You know what, let me move the mike.

18  A.  Okay.

19          THE CLERK:  Don't move -- go ahead.

20          MS. GOWIN:  Is this okay?

21          THE CLERK:  That's fine.

22  BY MS. GOWIN:

23  Q.  Is that better?

24  A.  That's better.

25  Q.  Thank you for the reminder.

Kraft - cross

1       You are not testifying today that something Officer

2   Cassidy did caused the central retinal vein occlusion in Sara

3   Kuper's right eye, correct?

4   A.  Yes.  I don't even know who Officer Cassidy is.

5   Q.  You're not -- I'm sorry.  Officer Cassidy is the gentleman

6   sitting at the end of the table there.

7   A.  Okay.

8   Q.  So you're not testifying that something the police did

9   caused the central retinal vein occlusion in Sara Kuper's

10  right eye, correct?

11  A.  I know nothing about what the police may or may not have

12  done.

13  Q.  Okay.  And you can't say with a reasonable degree of

14  medical certainty that what caused the vein occlusion in Sara

15  Kuper's right eye, correct?

16  A.  That is correct.

17  Q.  So you just don't know what caused it?

18  A.  That is correct.

19  Q.  And you would agree that the vein occlusion could have

20  been caused by Sara's longstanding hypertension, correct?

21  A.  That is a possibility, yes.

22  Q.  With hypertension being the same thing as high blood

23  pressure, right?

24  A.  Hypertension is high blood pressure, yes.

25  Q.  And you mentioned you have treated Sara Kuper since the

Kraft - cross

32

 1    1980s, correct?

 2    A.  Correct.

 3    Q.  And do you know that Sara can get very excited sometimes,

 4    correct?

 5    A.  In my office, she doesn't get too excited, but I imagine

 6    anybody can.

 7    Q.  And Shoshana Cooper, her daughter, accompanies Sara to all

 8    appointments, correct?

 9    A.  I believe so, yes.

10    Q.  You've seen Shoshana Cooper and Sara Kuper interact for

11    many years, correct?

12    A.  Yes.

13    Q.  And from what you've seen of them in your office, you know

14    that the interaction between Shoshana and Sara is enough to

15    raise someone's blood pressure, correct?

16    A.  The two have been at odds with one another on occasion,

17    yes.

18    Q.  Sara Kuper has a long history of eye problems, right?

19    A.  Yes.

20    Q.  And since Shoshana accompanies Sara to all of the

21    appointments, Shoshana is well aware of Sara's long history of

22    eye problems, correct?

23              MR. J. RICHARDS:  Objection.

24              THE COURT:  Sustained.

25    BY MS. GOWIN:

Kraft - cross

1   Q.  You have -- over the years, you have informed both Sara

2   and Shoshana of many eye problems that Sara Kuper suffers,

3   correct?

4   A.  I would not characterize it as "many."  She has glaucoma.

5   She's had cataracts.  These are common problems that we see in

6   elderly.  She has no other major issues other than those two.

7   Q.  Okay.  And so when you talked about those conditions,

8   you've discussed them with both Sara and Shoshana, correct?

9   A.  Yes.  They are generally both in the room together.

10  Q.  Shoshana Cooper and her lawyer are the people who asked

11  you to testify in this case, correct?

12  A.  Yes.

13  Q.  And Shoshana Cooper asked you to testify about whether

14  high blood pressure contributed to Sara's vein occlusion,

15  correct?

16  A.  Yes.

17  Q.  Now, you'd admit that you're not an expert in retinal

18  medicine, correct?

19  A.  That is correct.

20  Q.  And you'd agree that you've never done any research on

21  central retinal vein occlusions, correct?

22  A.  That is correct.

23  Q.  And you've never written or published any scholarly

24  articles about the condition either, right?

25  A.  That is correct.

Kraft - cross

34

```
 1    Q.  And in fact, you're not testifying today as an expert in

 2    retinal medicine, correct?

 3    A.  I am not testifying as a retinologist, that is correct.

 4    Q.  Your opinion regarding Sara Kuper is based exclusively on

 5    two sources of information, right; your 2001 treatment records

 6    for Sara Kuper, correct?

 7    A.  2001?

 8    Q.  I'm sorry.  2011.  Thank you.

 9    A.  Okay.

10    Q.  Your 2011 treatment records, correct?

11    A.  That is one issue, yes.

12    Q.  And the other source of information was Dr. Robert

13    Schroeder's consultation reports, correct?

14    A.  Yes, and also my examination.

15    Q.  Okay.  So your treat -- your examination and treatment of

16    Sara and Dr. Robert Schroeder's consultation reports, correct?

17    A.  Correct.

18    Q.  You didn't review anything else in reaching your opinion?

19    A.  I'm not sure I understand what you mean by "reviewing

20    anything else."

21    Q.  You didn't review anything besides your own treatment

22    records and Dr. Schroeder's consultation reports in order to

23    reach your opinion, correct?

24    A.  That is correct.

25    Q.  And you didn't rely on anything else in reaching your
```

Kraft - cross

1  opinion, correct?

2  A.  That is correct.

3  Q.  And you limited your review and analysis to those records

4  because that's what plaintiff's counsel asked you to do,

5  correct?

6  A.  No.  They didn't ask me to limit anything.

7  Q.  Okay.  So you never reviewed the deposition that Sara

8  Kuper gave in this case, correct?

9  A.  That is correct, I have never reviewed a deposition.

10  Q.  And you've never reviewed Shoshana's deposition in this

11  case either, correct?

12  A.  That is correct.

13  Q.  And obviously, you haven't been present as they testified

14  this week, correct?

15  A.  That is correct.

16  Q.  Now, the interaction with -- between Sara and Shoshana

17  Cooper and the police occurred on September 4th, 2011.  You

18  didn't see Sara Kuper on September 4th, correct?

19  A.  That is correct.

20  Q.  And you didn't see her on September 5th?

21  A.  That is correct.

22  Q.  And you didn't see her on September 6th?

23  A.  Correct.

24  Q.  And you didn't see her on September 7th, correct?

25  A.  That is correct.

Kraft - cross

36

1    Q.  You didn't see her until September 8th, right?

2    A.  That is correct.

3    Q.  And to the best of your knowledge, Sara Kuper didn't try

4    to come in any of those earlier days either, right?

5    A.  I don't know.  It depends what day of the week that it

6    occurs on.  If the day -- I usually am in the office only on

7    Wednesdays and Thursdays.  So if this happened at some other

8    time, she may have called the office and they said, "Well,

9    Dr. Kraft is not going to be here until Wednesday."  That may

10   have delayed her from coming in for a few days.

11   Q.  You don't know, you don't have any knowledge that she --

12   that those calls were made, though, correct?

13   A.  That is correct, I have no knowledge, but I don't know

14   what the calendar and what the dates are, if I look back at

15   the calendar, what day we actually saw her, what day of the

16   week.

17   Q.  Okay.  And at that point, Sara Kuper was already also

18   under the care of Dr. Schroeder, correct?

19   A.  That is correct.

20   Q.  Because she'd had a vein occlusion in her left eye in

21   2010, correct?

22   A.  That is correct.

23   Q.  And that was the first time you had referred Sara Kuper to

24   Dr. Schroeder, the retinal expert --

25   A.  That is correct.

Kraft - cross

1    Q.  -- right?

2          Now, the central retinal vein occlusion is a fairly

3    common eye condition, correct?

4    A.  I think the statistics say it occurs about 1 in 1,000

5    patients.

6          MS. GOWIN:  And I would like to talk first about what

7    the causes are of the vein occlusion.  If you'll give me one

8    moment, I have a board I want to put up over here.

9          Your Honor, may I bring the board up?  Thank you.

10   BY MS. GOWIN:

11   Q.  Now, Dr. Kraft, you would agree that one condition that

12   can cause a vein occlusion is hypercoagulability, correct?

13   A.  Yes.

14   Q.  And that would be a condition in which someone clots more

15   easily than normal, correct?

16   A.  That's one condition, yes.

17   Q.  Okay.  So I wrote up here "clots easily" under "causes."

18          Another cause -- and one type of condition in which

19   one clots more easily than normal would be factor V Leiden,

20   correct?

21   A.  That is a cause, yes -- repeat that question again.

22   Q.  One condition that patients can suffer from that causes

23   them to clot more easily is a genetic mutation called factor V

24   Leiden, correct?

25   A.  That is correct.

Kraft - cross

38

```
 1   Q.  And I know I'm a little further from you now, so if you
 2   can't hear me, please let me know.  I'd be happy to repeat
 3   myself.
 4           All right.  And another cause is hypertension,
 5   correct?
 6   A.  Correct.
 7   Q.  And that's the same thing as high blood pressure, right?
 8   A.  Correct.
 9   Q.  And when we talk about hypertension, we're talking about
10   chronic long-term hypertension, correct?
11   A.  Not necessarily.
12   Q.  But --
13   A.  It could be acute hypertension, sudden hypertension.  I
14   mean, hypertension is a generic word for high blood pressure.
15   It can be acute, chronic.
16   Q.  Okay.  So either one would be referred to with high blood
17   pressure; is that fair?
18   A.  Right.
19   Q.  Okay.  And a third cause is also glaucoma, correct?
20   A.  No.
21   Q.  Pardon?
22   A.  No.
23   Q.  Okay.  You don't agree that glaucoma is a cause of vein
24   occlusions?
25   A.  I thought you were talking about hypercoagulability.
```

Kraft - cross

1  Q.  Oh, I'm sorry.  I was going to talk about three causes,

2  three potential causes of vein occlusions.  One is

3  hypercoagulability, blood clot -- the blood clots easily,

4  right?

5  A.  Uh-huh.

6  Q.  The second is high blood pressure, and the third is

7  glaucoma, correct?

8  A.  No, I don't believe glaucoma is a major cause of central

9  retinal vein occlusion.

10  Q.  Is it associated with central retinal vein occlusion?

11  A.  Not really, no.

12  Q.  Now, Sara Kuper experienced a -- Sara Kuper experienced a

13  central retinal vein occlusion in her left eye in July 2010,

14  correct?

15  A.  Correct.

16  Q.  And it was at that time you sent her to be treated for

17  that condition to Dr. Robert Schroeder, correct?

18  A.  Correct.

19  Q.  And you sent her there because he's a retinal specialist,

20  right?

21  A.  Correct.

22  Q.  And you sent him because you feel that he has more

23  expertise in treating this condition than you do?

24  A.  No, because he has the more tools and ability to treat

25  retinal diseases than I do.

Kraft - cross

40

```
 1   Q.  You feel like you have the same level of expertise as
 2   Dr. Schroeder?
 3   A.  Not when it comes to injecting in the eye.
 4   Q.  Okay.  And so you would agree that he treats a lot more
 5   vein occlusions than you do?
 6   A.  Yes.
 7   Q.  And you feel like he's a good doctor, correct?
 8   A.  Yes.
 9   Q.  You wouldn't send your patients to somebody you didn't
10   trust, right?
11   A.  Correct.
12   Q.  And then when Sara Kuper experienced the vein occlusion in
13   August -- or in September of 2011, she had already been
14   treated by Dr. Schroeder, correct?
15   A.  Yes.
16   Q.  And so you said you made an appointment the same day, on
17   September 8th, to get her in to see Dr. Schroeder for her
18   right eye, correct?
19   A.  Correct.
20   Q.  Now, we mentioned that Sara Kuper was under -- was being
21   treated by Dr. Schroeder prior to her interaction with Officer
22   Cassidy.  And he sent you a letter, a consultation report, on
23   April 25th, 2011, correct?
24   A.  I believe so, yes.
25   Q.  And you relied upon it in reaching your opinions in this
```

Kraft - cross

 1  case, correct?

 2  A.  For which -- I relied on that for what?

 3  Q.  You reviewed it as you came to your -- as you reached your

 4  opinions in this case, correct?

 5  A.  I'm sure I have reviewed it, yes.

 6          MS. GOWIN:  Your Honor, may I approach the witness?

 7          THE COURT:  Yes.

 8          MS. GOWIN:  I'd like to mark this document as

 9  Defendants's Exhibit 6, for identification.

10  BY MS. GOWIN:

11  Q.  Dr. Kraft, you have seen this letter before, correct?

12  A.  Yes, I have, yes.

13  Q.  Okay.  And this is part of what you reviewed in reaching

14  your opinions in this case, correct?

15  A.  I may not have reviewed it that particular day, but this

16  is in part, probably would be part of her record, yes.

17          MS. GOWIN:  Your Honor, I'd like to offer this into

18  evidence as Defendant's Exhibit 6.

19          THE COURT:  Any objection?

20          MR. J. RICHARDS:  No objection.

21          THE COURT:  It may be admitted.

22          MS. GOWIN:  Thank you, your Honor.

23    (Defendant's Exhibit 6 received in evidence.)

24          MS. GOWIN:  I'd like to first direct your

25  attention -- your Honor, could you please turn on the Elmo --

Kraft - cross

42

 1  I'm sorry.  May I publish this to the jury?

 2          THE COURT:  You may.

 3  BY MS. GOWIN:

 4  Q.  All right.  I'd like to point your attention to, direct

 5  your attention to the fourth line in the first paragraph where

 6  it says, "Ms. Kuper has a history of glaucoma and is on

 7  Timoptic in both eyes."

 8          Would you agree with his statement that Ms. Kuper had

 9  a history of glaucoma?

10  A.  Yes.

11  Q.  And can you explain to the jury what Timoptic is and what

12  it's used for?

13  A.  Timoptic is an eye drop that we use to lower the pressure

14  in the eye.  It's an anti-glaucoma medication.

15  Q.  All right.  And this is -- this examination that

16  Dr. Schroeder is reporting on occurred four months before

17  Sara Kuper's interaction with Officer Cassidy on September

18  4th, correct?

19  A.  Yes --

20          MR. J. RICHARDS:  Objection.

21          THE COURT:  Basis?

22          MR. J. RICHARDS:  I'm not sure the months's count is

23  accurate.

24          MS. GOWIN:  Four months, seven days.  Okay.  I'm

25  sorry.  I'll withdraw the question.

Kraft - cross

1      THE COURT:  The objection is overruled.  Ask your

2  next question, please.

3  BY MS. GOWIN:

4  Q.  And you had performed cataract surgery on Sara's left eye

5  in February 2011, correct?

6  A.  That is correct.

7  Q.  Hypertension is a known risk factor for cataracts,

8  correct?

9  A.  Excuse me?

10  Q.  Hypertension is a known risk factor for cataracts,

11  correct?

12  A.  No.

13  Q.  I'd like to draw your attention further down on Page 1

14  where it says, "fundoscopic examination," the first paragraph

15  where it says "OD."

16  A.  Uh-huh.

17  Q.  And in your profession, OD is an abbreviation for the

18  right eye, correct?

19  A.  That is correct.

20  Q.  Okay.  And I'd also like to draw your attention to the

21  third line where it says that he observed moderate

22  arteriosclerotic vascular changes.  Do you see that?

23  A.  Yes.

24  Q.  Can you explain what that means -- I'm sorry.

25      Arteriosclerotic vascular changes means that he's

Kraft - cross

44

1   observing that the blood vessels in Sara Kuper's eyes are

2   hardening and narrowing, correct?

3   A.  That's what that says, yes.

4   Q.  Okay.  And if you could turn to Page 2, please, I'd like

5   to direct your attention all the way down to the bottom where

6   at the bottom it says, "Bert, we did discuss the potential

7   systemic etiologies associated with venous occlusive disease

8   in general."

9        Potential systemic etiologies means some sort of

10  overall health issue that could be caught -- that are

11  potential causes for the vein occlusion, correct?

12  A.  That is correct.

13  Q.  And here -- and then in the next line he says, "I

14  explained that this is most often associated with

15  hypertension, diabetes, as well as hypercholesterolemia."

16       So you would agree that hypertension is a factor

17  often associated with vein occlusions?

18  A.  Yes, absolutely.

19  Q.  Okay.  The next line he says, "I have suggested that she

20  consider seeing her internist, Dr. Zahtz, to undergo

21  additional workup.  This could include an evaluation for

22  unusual coagulopathies such as," and there's a list, and one

23  is factor V Leiden.

24       Do you see that?

25  A.  Yes.

Kraft - cross

```
 1   Q.  Did you -- did you ever follow up with Sara Kuper around

 2   the time that you received this letter and ask her if she'd

 3   followed up with Dr. Zahtz?

 4   A.  I don't believe I followed up with her specifically on it.

 5   I know she received a copy of this letter because it said it

 6   was sent to her daughter -- or sent to her as a copy of it.

 7   And it was sent to her internist.  So I did not personally get

 8   involved in whether or not she had the test done.

 9   Q.  Okay.  So you didn't -- the next time you saw Sara Kuper,

10   you don't recall asking to make sure she had done that?

11   A.  That is correct.  And I don't recall when the next time

12   was that I saw her.

13   Q.  Then at the bottom of the page from Page 2 into 3, it

14   says, "Bert, she does indicate that she does occasionally

15   check her blood pressure along with her daughter and

16   apparently there have been some more elevated readings.  I did

17   emphasize the importance of seeing Dr. Zahtz for further

18   evaluation."

19        Were you aware that she -- that she had -- that Sara

20   Kuper had been having elevated blood pressure readings?

21   A.  Yes.

22   Q.  You were aware of that?

23   A.  Yes.

24   Q.  But when -- and there's no indication here that

25   Dr. Schroeder ever took his -- took her blood pressure
```

Kraft - cross

1  himself, correct?

2  A.  Most ophthalmologists do not take blood pressures.  I

3  don't take the blood pressure.  It is really not in our realm

4  of the medical care at this point.  And so if he knows, as I

5  know, that she has an internist that she works with, our first

6  recommendation is to go back to your internist, your internist

7  knows you, and they would know whether they're dealing with a

8  true blood pressure elevation or not.

9  Q.  And from an ophthalmologist's perspective, it's pretty

10 important that a patient would take steps to address

11 hypertension, correct?

12 A.  Well, but all you can do is suggest to the patient that

13 they do it.  I cannot hold their hand and bring them in to the

14 doctor's office.

15 Q.  Of course, because everybody has to make their own

16 choices, right?

17 A.  Correct.

18 Q.  And but you would agree, that was an important thing that

19 needed to be addressed?

20 A.  Yes.  And that was -- as I said in my earlier testimony,

21 that's exactly what I said.  The first thing we do when

22 someone comes in, to get a medical workup.

23 Q.  You examined Sara on May 11, 2011, correct?

24      Would you like a copy of your records to help?

25 A.  I guess so, yes.

Kraft - cross

```
 1   Q.  Okay.  I'm sorry.  Would that refresh your recollection?

 2   A.  That would definitely refresh recollection.

 3           MS. GOWIN:  Any objection if I give it to him?

 4           MR. J. RICHARDS:  No objection.

 5           MS. GOWIN:  May I approach the witness?

 6           THE COURT:  You may.

 7           MS. GOWIN:  Thank you.

 8   BY MS. GOWIN:

 9   Q.  I think that's two copies there.  Don't let it throw you.

10   A.  That's okay.

11   Q.  Are you ready?

12   A.  Yes.

13   Q.  Okay.  This examination on May 11, 2011, is just a routine

14   office visit, correct?

15   A.  That is correct.

16   Q.  Okay.  And on May 11th, her -- the vision in her right eye

17   was measured at 20/25 minus 2, correct?

18   A.  That is correct.

19   Q.  Can you explain what that number means?

20   A.  Excuse me?

21   Q.  Can you explain what that number means?

22   A.  Oh, 20/25 is just slightly less than 20/20 vision.  So it

23   just means that, as I explained earlier, 20/20 is you can see

24   an object at 20 feet.  20/25 means that she would have to be

25   five feet closer.
```

Kraft - cross

1  Q.  Okay.

2  A.  It's very good vision.

3  Q.  And this would be with the eye chart we're all familiar

4  with, right?

5  A.  Correct.

6  Q.  With the letters and the different sizes?  Okay.

7        And what does the minus 2 mean?

8  A.  That means, usually there's five letters on a line.  That

9  means she read three out of the five letters.

10  Q.  Doctor, you recognize what I gave you as your medical

11  records, correct?

12  A.  Yes.

13  Q.  And were these kept in the normal course of your business,

14  your medical practice?

15  A.  Yes.

16  Q.  And they -- were the information in them recorded at or

17  close to the time at which you examined her?

18  A.  Yes.

19        MS. GOWIN:  Your Honor, I'd like to move to admit

20  these as Defendant's Exhibit 7.

21        MR. J. RICHARDS:  No objection.

22        THE COURT:  They will be admitted without objection.

23    (Defendant's Exhibit 7 received in evidence.)

24        MS. GOWIN:  May I publish them to the jury, your

25  Honor?

Kraft - cross

49

1          THE COURT:  They may be published.

2          MS. GOWIN:  Thank you.

3   BY MS. GOWIN:

4   Q.  Okay.  So these are your medical records, what's visible

5   on the screen is your medical records for four -- or three

6   different appointments, correct?

7   A.  I can't hear you.

8   Q.  I said, what's showing on the screen up here in

9   Defendant's Exhibit 7 is your -- the totality of your medical

10  records for three different visits in 2011, correct?

11  A.  That is correct.

12  Q.  Okay.  And in -- on May 11th at the office visit, is there

13  any indication that you took Sara's blood pressure?

14  A.  No.

15  Q.  I'm going to ask you this over and over, so maybe I'll

16  just ask it once.  Did you ever take Sara Kuper's blood

17  pressure?

18  A.  No, I did not.

19  Q.  You have a blood pressure cuff in your office, correct?

20  A.  That is correct.

21  Q.  But you did not particularly use it for Sara Kuper?

22  A.  That is correct.

23  Q.  Now, you also examined Sara Kuper on July 9th, 2011,

24  correct?

25  A.  Yes.

```
 1   Q.  And Sara also had made an appointment for September 3rd,

 2   2011, correct?

 3   A.  That is correct.

 4   Q.  But your records indicate that it was rescheduled,

 5   correct?

 6   A.  Correct.

 7   Q.  So she canceled or rescheduled sometime before she came in

 8   that day or before she was supposed to come in that day?

 9   A.  Right.

10   Q.  Okay.  And September 3rd would be the day before her

11   interaction with Officer Cassidy, correct?

12   A.  I guess so.

13   Q.  Now, if Sara or Shoshana Cooper had called you and said --

14   and described Sara's symptoms to you, would you have deemed

15   that an emergency?

16           MR. J. RICHARDS:  Objection.

17           THE COURT:  No, overruled.

18   BY MS. GOWIN:

19   Q.  You may answer.

20   A.  I may have.  I would have had to have talked to her and

21   asked her exactly what was going on.

22   Q.  Okay.  And would you have tried to get her in as soon as

23   possible?

24   A.  I may have, depending upon what she told me and what the

25   circumstances were.
```

Kraft - cross

51

1  Q.  Okay.  Knowing now what you knew then, would you have

2  deemed it -- or knowing then what you know now, would you have

3  deemed it an emergency?

4          MR. J. RICHARDS:  Objection.

5          THE COURT:  Basis?

6          MR. J. RICHARDS:  Speculation.

7          THE COURT:  Overruled.

8  BY MS. GOWIN:

9  Q.  Go ahead.

10  A.  I'm not sure that it would have made any difference.

11  Q.  Okay.  You examined -- and so you examined Sara Kuper on

12  September 8th, correct?

13  A.  That is correct.

14  Q.  And at that point, the vision in her right eye was

15  assessed at 20/80, correct?

16  A.  That is correct.

17  Q.  That's not blind, correct?

18  A.  Excuse me?

19  Q.  That's not -- she was not blind in her right eye, correct?

20  A.  That is correct.

21  Q.  And the record also -- that record also indicates that

22  Sara Kuper had been diagnosed with primary open angle

23  glaucoma, correct?

24  A.  I don't see where it says that, but she has had that

25  diagnosis for many, many years, but it does not say that on

Kraft - cross

 1  this record.

 2  Q.  And that wasn't new that day, though, right?

 3      That wasn't new on September 8th?

 4  A.  No, it was not.

 5  Q.  Now, as you look at this record, there is no mention of

 6  the police at all in this record, correct?

 7  A.  That is correct.

 8  Q.  And you don't remember whether Sara Kuper even mentioned

 9  the police at the September 8th appointment, correct?

10  A.  That is correct.

11  Q.  In fact, there's nothing in this record at all about

12  possible causes for the vein occlusion?

13  A.  There would be no reason for me to put that into the

14  record at this point.

15  Q.  So you referred Sara -- or you -- Sara went to see Robert

16  Schroeder, Dr. Schroeder later that day, correct?

17  A.  Correct.

18  Q.  Did you facilitate that, or did she do that on her own?

19  A.  Oh, we facilitated that.

20  Q.  Okay.  And you got her in to see Dr. Schroeder that same

21  day, correct?

22  A.  That is correct.

23      MS. GOWIN:  Now, I'd like to show you what I am

24  marking as Defendant's Exhibit 8.

25      Your Honor, may I approach?

Kraft - cross

53

```
 1            THE COURT:  You may.

 2   BY MS. GOWIN:

 3   Q.  Do you recognize this document?

 4   A.  Yes, I do.

 5   Q.  Is this part of what you reviewed as you were reaching

 6   your conclusions in this case?

 7   A.  This report didn't come in for about three weeks

 8   afterwards, but it's one of the items that I used to review my

 9   opinion, yes.

10   Q.  Okay.  And this is a letter to you from Dr. Schroeder

11   dated September 8, 2011, correct?

12   A.  Yes.

13   Q.  But in your recollection, you may have gotten it some

14   weeks, a few weeks later, correct?

15   A.  Correct.

16   Q.  But still in 2011, right?

17            MS. GOWIN:  Okay.  Your Honor, I'd like to move

18   for -- to admit Defendant's Exhibit 8.

19            MR. J. RICHARDS:  No objection.

20            THE COURT:  It's admitted without objection.

21     (Defendant's Exhibit 8 received in evidence.)

22            MS. GOWIN:  May I publish to the jury, your Honor?

23            THE COURT:  It may be published.

24   BY MS. GOWIN:

25   Q.  All right.  I'd like to direct your attention to the
```

Kraft - cross

1   second paragraph where it says, "Bert, as you know from my

2   consultation of April 25th, I strongly advised Ms. Kuper and

3   her daughter to see Dr. Zahtz, their internist, to undergo a

4   medical workup."

5         So again you would agree that Dr. Schroeder is

6   communicating that it's very, very important that the issue

7   of -- that her medical issues be addressed, correct?

8   A.  That is what he says, yes.

9   Q.  And you would agree with that, right?

10  A.  Yes, I agree with that.

11  Q.  And then the next sentence is odd.  It says, "Ms. Kuper,

12  as you know, did not have any known risk factors, for example,

13  hypertension."

14        Did you notice that when you first read this?

15  A.  Yes.

16  Q.  And what did you make of that?

17  A.  That was -- I don't know if that was correct or not.  That

18  is standard -- when you look up central retinal vein

19  occlusion, the three diagnoses, that's the standard

20  treatment -- that's the standard thing that they'll say when

21  talking about central retinal vein occlusions.

22        Whether or not she actually had the hypertension or

23  not, he said earlier he wanted to have her worked up.  He was

24  just talking -- I believe, and I can't speak for him

25  specifically, he was talking about what the general risk

Kraft - cross

 1  factors are for high blood pressure --

 2  Q.  Right, but --

 3  A.  -- or for central retinal vein occlusion.

 4  Q.  Sorry about that.  But he's wrong about her not having

 5  hypertension, correct?

 6  A.  I believe so, yes.

 7  Q.  Yes.  Did you reach out to him and correct his mistake?

 8  A.  No.

 9  Q.  Okay.  And then a few sentences down, the fifth

10  line, "Ms. Kuper's daughter indicated that because of their

11  monetary situation they did not follow up with Dr. Zahtz."

12          Is that consistent with your understanding of the

13  choices that Sara Kuper made?

14  A.  I'm sorry.  Could you repeat that, please?

15  Q.  Yes.  Is that consistent with your understanding of the

16  choices that Sara Kuper made about her medical care?

17          MR. J. RICHARDS:  Objection, foundation.

18          THE COURT:  Lay a foundation.

19  BY MS. GOWIN:

20  Q.  You discussed Sara Kuper seeking other medical care or

21  seeking medical care from her internist for her systemic

22  medical issues, correct?

23  A.  I don't follow what your question is.

24  Q.  That's okay.  That's fine.  We'll go back.  We'll go back

25  to this.

Kraft - cross

56

1          Okay.  And then I -- you would -- and then the last

2     line of that paragraph, "Ms. Kuper interestingly was noted to

3     have the factor V Leiden gene and did not address this with

4     Dr. Zahtz."

5          Is this the first time you learned that Sara Kuper

6     had the factor V Leiden gene?

7     A.  Yes.

8     Q.  Okay.  You mentioned on direct that you believe that Sara

9     Kuper had an eye injection on September 8th from

10    Dr. Schroeder, correct?

11    A.  Yes, I believe so.

12    Q.  Okay.  But I'd like to direct your attention to the last

13    paragraph of Page 1 where it indicates, "I have recommended

14    that she consider anti-VEGF therapy."

15         Would you agree that that indicates that she did not

16    have -- she did not start injections at that time?

17    A.  Yes, I guess they did not have it that day.

18    Q.  So later?

19    A.  Until later, yes.

20    Q.  All right.  Next, I'd like to show you what I've marked as

21    Defendant's Exhibit 8.  Do you recognize this document?

22         Do you recognize this document?

23    A.  Yes, I recognize this letter.

24    Q.  Okay.  And you would agree that this is an October 20 --

25    October 20th, 2011, report from Dr. Schroeder to you

Kraft - cross

 1   concerning Sara Kuper?

 2   A.  That is correct.

 3   Q.  And you -- did you rely on this document in coming -- in

 4   reaching your conclusions in this case?

 5   A.  I don't think this particular letter had any bearing on my

 6   conclusions.

 7   Q.  But you admit that you reviewed it --

 8   A.  Yes.

 9   Q.  -- in preparing your opinions; is that correct?

10   A.  Yes.

11        MS. GOWIN:  Okay.  Your Honor, I move to admit the

12   document marked Defendant's Exhibit -- I'm sorry, Defendant's

13   Exhibit 9.

14        THE COURT:  Have your questions been about Exhibit 9

15   or Exhibit 8?

16        MS. GOWIN:  Yes, I'm sorry.  They were about Exhibit

17   9.  I apologize.  I'm a bit off in my numbering.  I move for

18   the admission of Defendant's Exhibit 9.

19        MR. J. RICHARDS:  No objection.

20        MS. GOWIN:  May I publish, your Honor?

21        May I publish to the jury, your Honor?

22        THE COURT:  I heard you.

23        MS. GOWIN:  I'm sorry.

24        THE COURT:  So the record is clear, we're now

25   referring to Defendant's Exhibit 9, the last, I believe, four

Kraft - cross

1    questions.  It may be admitted into evidence without

2    objection, and it may be published.

3           MS. GOWIN:  And Defendant's Exhibit 9 is an October

4    20 letter from Dr. Schroeder.

5      (Defendant's Exhibit 9 received in evidence.)

6    BY MS. GOWIN:

7    Q.  Dr. Kraft, I'd like to direct your attention to the last

8    two -- last two sentences of the first full paragraph.  It

9    says, "There has been a definite improvement in her vision.

10   Initially she was 20/100 and today she is 20/50 in the right

11   eye."

12          Do you see that?

13   A.  Yes.

14   Q.  That's a significant improvement in the right eye at that

15   point, correct?

16   A.  Yes.

17          MS. GOWIN:  Your Honor, may I approach the witness?

18          THE COURT:  You may.

19   BY MS. GOWIN:

20   Q.  I'm handing you what has been marked as Defendant's

21   Exhibit 10.  Do you recognize this document?

22   A.  It's another letter from Dr. Schroeder.

23   Q.  This is a letter from Dr. Schroeder to you on January 5th,

24   2012, correct?

25   A.  Yes.

Kraft - cross

1  Q.  And you also reviewed this document in coming to your

2  conclusion in this case, correct?

3  A.  I probably reviewed this document.  I don't know whether I

4  used this for my conclusion or not.

5          MS. GOWIN:  Your Honor, I move to admit Defendant's

6  Exhibit 10.

7          MR. J. RICHARDS:  No objection.

8          THE COURT:  It may be admitted without objection.

9    (Defendant's Exhibit 10 received in evidence.)

10          MS. GOWIN:  May I publish it, your Honor?

11          THE COURT:  It may be published.

12          MS. GOWIN:  Thank you.

13  BY MS. GOWIN:

14  Q.  I'd like to direct your attention to the sentence here

15  marked, "Bert."  If you look up on the screen, you'll see

16  where I am at.  Do you see it?

17  A.  Yes.

18  Q.  All right.  And the second sentence says, "I again

19  reviewed the situation with the daughter who is having a

20  difficult time accepting her mother's situation."

21          By "the daughter," do you understand that to mean

22  he's referring to Shoshana Cooper?

23  A.  Yes, I do.

24  Q.  And he further says, "I emphasized that there may be no

25  further improvement beyond this level.  She was hoping that

Kraft - cross

60

1   she would return to the 20/20 or 20/25 level."  Do you see

2   that there?

3   A.   Yes.

4   Q.   Assuming that that was Shoshana Cooper's expectation,

5   would that be a reasonable expectation?

6   A.   It could be, yes.

7   Q.   In Sara Kuper's particular case, would that be a

8   reasonable expectation?

9   A.   Prior to -- well, back in April, she was 20/25 vision.

10  And patients who have mild central retinal vein occlusion can

11  have close to a full recovery.

12  Q.   But only about 10 percent of people who suffer central

13  retinal vein occlusions?

14  A.   Well, you don't want to give up hope to anybody.

15  Q.   Sure.  But it's not a likely outcome, correct?

16  A.   It's still an outcome that can exist and be 100 percent

17  for that patient.

18  Q.   But it's certainly not a likely outcome, correct?

19  A.   It's hard to say.  I would really -- I never put absolutes

20  on things like that.

21          MS. GOWIN:  May I approach the witness, your Honor?

22          THE COURT:  You may.

23  BY MS. GOWIN:

24  Q.   Dr. Schroeder -- I'm showing you what I'm marking as

25  Defendant's Exhibit 11.  And this is a March 15, 2012, letter

Kraft - cross

1  from Dr. Schroeder to you, correct?

2  A.  Yes, it is.

3  Q.  And was this part of the documents that you reviewed in

4  reaching your opinions in this matter?

5  A.  Probably not.  This came much later.

6  Q.  Later than your opinions?

7  A.  Pardon?

8  Q.  Later than when you reached your opinion?

9  A.  Yes.  She had a central retinal vein occlusion six months

10  earlier than this letter.

11  Q.  Sure.  But this letter is dated March 15, 2012, correct?

12  A.  Correct.

13  Q.  Okay.  And your expert report in which you issued your

14  opinion in this case is dated February 7th, 2013, correct?

15  A.  Okay.  Yes.  All right.  I got my dates wrong.

16  Q.  So this letter would have been issued almost a year before

17  you issued your opinion?

18  A.  You are correct.  I had my dates wrong.

19          MS. GOWIN:  Sure.  No problem.  I get it.

20          Your Honor, I'd like to move to admit Defendant's

21  Exhibit 11 into evidence and publish it to the jury.

22          MR. J. RICHARDS:  No objection.

23          THE COURT:  It may be admitted.  It may be published.

24    (Defendant's Exhibit 11 received in evidence.)

25  BY MS. GOWIN:

Kraft - cross

1   Q.  Specifically, I would like to draw your attention to the

2   paragraph here, this here where it starts there, "Bert, on

3   discussion today Ms. Kuper indicated that she was not using

4   aspirin."

5           It had been recommended that Sara Kuper start taking

6   aspirin, correct?

7   A.  Excuse me?

8   Q.  It had been recommended that Sara Kuper begin taking

9   aspirin, correct?

10  A.  I think one of the other doctors recommended it according

11  to Dr. Schroeder's letter and the paragraph above the one

12  you're just referring to.

13  Q.  Okay.  And then I take you down a couple lines, and the

14  letter reads, "She, as you know, remains convinced that her

15  vein occlusions are related to some previous altercations she

16  had with the police and not related to her hypertension and

17  factor V Leiden," correct?

18  A.  That's what it says, yes.

19  Q.  And then he goes on to say, "I indicated to her that this

20  in all likelihood is not the case but that she needs to

21  maintain control of her hypertension and take her aspirin."

22  Did I read that correctly?

23  A.  Yes, you read the words correctly.

24  Q.  And so Dr. Schroeder, the retinal specialist to whom you

25  referred Sara Kuper for treatment, disagrees with your

Kraft - cross

 1   conclusion in this case, correct?

 2   A.  Could be, yes.  That's his opinion.

 3          MS. GOWIN:  Your Honor, may I have a moment to confer

 4   with counsel?

 5          THE COURT:  You may.

 6     (Pause.)

 7   BY MS. GOWIN:

 8   Q.  I'm sorry.  Dr. Kraft, just a couple more questions.  You

 9   agree with Dr. Schroeder that the vein occlusion could have

10   been caused by Sara's longstanding hypertension, correct?

11   A.  I believe that hypertension is one of the causes of

12   central retinal vein occlusion.

13   Q.  You agree -- you would also agree with Dr. Schroeder that

14   factor V Leiden certainly may be the cause of Sara's central

15   retinal vein occlusions?

16   A.  No, I disagree with that.

17   Q.  But you are not telling the jury today that something the

18   police did caused the vein occlusion in Sara's right eye,

19   correct?

20   A.  No, I am not telling them that.

21   Q.  And you can't say with a reasonable degree of medical

22   certainty what caused the vein occlusion, correct?

23   A.  That is correct.

24          MS. GOWIN:  Thank you.  I tender the witness.

25          THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. J. RICHARDS:

Q.   Doctor, you were asked about glaucoma.  What is that?  And
if you need a minute to take a sip of water, that's fine.

A.   Glaucoma is a disease of the eye in which for practical
purposes, the pressure in the eye is too high, and it kills
the nerve cells in the eye, and one will silently go blind.
That's called chronic open angle glaucoma.

Q.   When you talk about pressure in the eye, are you talking
about blood pressure?

A.   No, we're not talking about blood pressure.  We're talking
about pressure in the eye, just like you could have a baseball
or a football that's hard and a football that's soft.  An eye
has its own individual pressure and has nothing to do with the
systemic blood pressure.

Q.   Does a person with glaucoma have diabetes?

A.   Not necessarily, no.

Q.   So a person without diabetes can still have glaucoma?

A.   Yes.  A person without diabetes can have glaucoma.

Q.   Does glaucoma lead to central retinal vein occlusion?

A.   Not in my experience, no.

Q.   Cataracts were mentioned.  What are those?

A.   Cataract means that the lens of the eye which is normally
crystal clear, it's called a crystalline lens, is no longer
clear.  And if it's no longer clear, the light that goes into

Kraft - redirect

65

1   our eye becomes fuzzy or filmy.  And so any cloudiness of this

2   normally clear lens is by definition called a cataract.

3   Q.  How is -- how is a cataract related to central retinal

4   vein occlusion?

5   A.  Cataracts are not related to central retinal vein

6   occlusion.

7   Q.  Will -- a person having a cataract, will that fact cause

8   someone to have central retinal vein occlusion?

9   A.  Not at all, no.

10  Q.  Will some -- would someone having cataract surgery make

11  them more likely to have a central retinal vein occlusion?

12  A.  No.

13  Q.  Back to glaucoma, some -- would someone getting treatments

14  for glaucoma, would that treatment cause someone to develop a

15  central retinal vein occlusion?

16  A.  No.  None of the treatments that we use for glaucoma are

17  related to central retinal vein occlusion.

18  Q.  I'd like to turn your attention to Defendant's Exhibit 6,

19  Page 2.  I'm putting it up on the overhead.

20          Now, can you see Defendant's Exhibit 6, Page 2 on

21  your screen at the witness stand?

22  A.  Yes.

23  Q.  And if you look at the bottom of that page, it says, "I

24  explained that this is most often associated with

25  hypertension, diabetes, as well as hypercholesterolemia."

1   A.  That's correct.

2   Q.  Did I say that right?

3   A.  That means high cholesterol.

4   Q.  High cholesterol?

5   A.  Right.

6   Q.  Now, diabetes does not mean glaucoma, correct?

7   A.  That is correct.

8   Q.  Does hypercholesterolemia mean clotting factors?

9   A.  No.  That has nothing to do with clotting factors.

10  Q.  What's the difference?

11  A.  Hypercholesterolemia is, people would have high

12  cholesterol.  And that's more likely associated with a heart

13  attack, okay, where you -- hardening of the arteries due to

14  high cholesterol or high triglycerides.  So that would have

15  nothing to do with vein occlusion.

16          MR. J. RICHARDS:  Your Honor, for the record, I'm

17  removing Defendant's Exhibit 6 from the overhead.

18  BY MR. J. RICHARDS:

19  Q.  Now, when someone gets injections in treatment for a

20  central retinal vein occlusion, do you know if the timing of

21  those treatments is related to possible outcomes of returned

22  vision?

23  A.  The -- I think Dr. Schroeder explained in one of his

24  letters that the national study that was done to recommend

25  this treatment felt that they would need about nine shots a

Kraft - redirect

1    year.  However, it is really based on a combination of other

2    factors of how well the patient is doing.

3         If the patient has had a very good result after only

4    two or three injections, they may say, well, let's not do the

5    injection next month.  Let's maybe wait until the month after.

6    Let's see if it's going to continue to hold.  So there's no

7    absolute treatment when it comes to that.

8    Q.  Can -- an injection immediately after the occurrence of a

9    central retinal vein occlusion, can that cure the outcome?

10   Can the patient become immediately whole again?

11   A.  I doubt it very much, that that would happen.  It's got to

12   be -- it's a long-term effect.  The normal retinal vein

13   occlusion in a person who didn't have the injection would take

14   three to six months for the hemorrhages to clear in the eye

15   under normal circumstances, meaning that it was not very

16   severe.

17        Even a small hemorrhage in the eye from some other

18   reason would take up to three months to disappear from the

19   inside of the eye.

20   Q.  Do the shots remove the hemorrhages?

21   A.  No.  The shots help to prevent the swelling in the back of

22   the eye and any abnormal blood vessels from growing in the

23   back of the eye.  And that takes time to develop, so that

24   being proactive in trying to prevent abnormal blood vessels

25   from growing in the eye and the condition getting worse.

Kraft - redirect

68

1    Q.  You were asked about factor V Leiden.  What is that?

2    A.  It's a genetic marker that occurs in our body relating to

3    the -- to the clotting factors that occur in a cascade of

4    events.  In other words, when you have a cut in your body, the

5    body wants to form a clot.

6          Well, there are a number of different sequences that

7    the body has to go through or steps that the body performs in

8    order to develop that clot.  And so, therefore, factor V

9    Leiden was discovered in the late 1940s, I believe, and is

10   just named that as one of the factors, one of the pathways.

11   And if there is an irregularity in one of these pathways, it

12   can lead to clotting states.

13   Q.  When you said "genetic," what does that mean?

14   A.  The --

15          MS. GOWIN:  Your Honor, I object.  This is the topic

16   at the sidebar.  This is beyond his expertise and not

17   disclosed.

18          THE COURT:  Response?

19          MR. J. RICHARDS:  Your Honor, "genetic" is a term

20   that any doctor would know how to explain that term.  And I

21   believe that the defense opened the door to this.

22          THE COURT:  The objection is overruled.

23   BY MR. J. RICHARDS:

24   Q.  What do you mean by "genetic"?

25   A.  Genetic means that you are born with that tendency.  You

1    have a mother and father.  Half of your genes come from the

2    mother and the father and that's -- you're the process of

3    that.  That's your genes, your genetics, part of your DNA.

4    Q.  Does every person with factor V Leiden form a central

5    retinal vein occlusion?

6    A.  No, not at all.

7    Q.  What's the incidence rate?

8    A.  The incidence of a retinal vein occlusion, central retinal

9    vein occlusion is 1 in 1,000.  The incidence of vein

10   occlusions in people who have Leiden V factor is less than 10

11   percent.

12          And people with Leiden V factor represent -- increase

13   the risk of a vein occlusion only four or five times or maybe

14   four to sixfold so that you actually, it increases your risk

15   of a central vein occlusion from 1 in 1,000 to maybe 2 or 3

16   per thousand at the higher limits.

17   Q.  Is it fair to say then that someone with a central retinal

18   vein occlusion and if that someone also had factor V Leiden,

19   is it fair to say that the factor V Leiden did not necessarily

20   cause the occlusion?

21   A.  I would say that that's a fair assumption, yes.

22          MR. J. RICHARDS:  May I have a moment, your Honor?

23          THE COURT:  Yes.

24     (Pause.)

25          MR. J. RICHARDS:  Nothing further, your Honor.

Kraft - redirect

70

 1          THE COURT:  Recross?

 2          MS. GOWIN:  Nothing further from the defense.  Thank

 3  you.

 4          THE COURT:  Sir, you may step down.

 5     (Witness excused.)

 6     (Proceedings were had which are not herein transcribed.)

 7              C E R T I F I C A T E

 8          I, Judith A. Walsh, do hereby certify that the

 9  foregoing is a complete, true, and accurate excerpt transcript

10  of the proceedings had in the above-entitled case before the

11  Honorable RONALD A. GUZMAN, one of the judges of said Court,

12  at Chicago, Illinois, on August 12, 2015.

13

14  /s/ *Judith A. Walsh, CSR, RDR, CRR*          August 12, 2015

15  Official Court Reporter

16  United States District Court

17  Northern District of Illinois

18  Eastern Division

19

20

21

22

23

24

25